Good morning everyone. Good morning. Good morning Judge Rovner. Good morning everyone. We're here today for oral arguments. We're going to begin with appeal number 24-1007 United States v. Damon Taylor and Ms. Krause will begin with you. Thank you so much. Good morning. Good morning. Please look to the court. My name is Michelle Krause. I serve as one of his trial attorneys. In a true threat case, the government must prove that the defendant recklessly made the threatening speech with some subjected understanding of the threatening nature of his statement. Counterman v. Colorado determined that the appropriate mens rea for a true threat is recklessness. In the context of a true threat crime, what that means is, is the speaker aware that his statements are threatening and then he delivers them anyway. In this case, the district court properly instructed the jury on this the need for the government to prove the subjective understanding that Mr. Taylor had at the time that he made the statements. The elements of the both of the charges that he was charged with were, one, that the defendant threatened to assault or murder an individual. Two, the individual was a U.S. employee. Three, that the defendant intended to impede, intimidate, or interfere with such employee while the employee was engaged in the performance of his or her duties. And four, that the defendant had some subjective understanding of the threatening nature of his statements. Ms. Krause, may I stop you for a moment? Yes, thank you. I certainly can appreciate how the testimony of, you know, from the Fort Wayne police officers and in particular the two individuals that interacted with Mr. Taylor at the Park Center might have helped the jury understand that when Mr. Taylor is having a bad day and he gets frustrated, he gets angry with an authority figure, he often makes threatening remarks. But would that testimony have spoken to the issue of whether Mr. Taylor subjectively understood the threatening nature of his statements to the assistant U.S. attorney? It seems entirely possible to me that even if it was routine for Mr. Taylor to make such remarks, that he might have made them precisely because he subjectively appreciated that the recipients would regard them as threatening violence. Your Honor, it's certainly possible that that evidence would have gone towards proving the mens rea, but what Counterman taught us and is telling us, and in the case that the government cited, the Garner case, in a true threat case, context matters. And so the context of everything that is going on, the government was permitted to bring in 404 evidence, so evidence of other instances or other conduct where, not on the dates when the alleged, the charged conduct occurred, but they were able to bring in other instances where he either showed up at the federal courthouse, he may or may not have been speaking about the alleged victim, and at times he perhaps he was speaking about the alleged victim, but not to the alleged victim. Can you point us to anything in the proffered testimony of these two individuals, the Fort Wayne police officers, that would have suggested more directly that Mr. Taylor was unable to appreciate or did not appreciate how the targets of his remarks would construe his remarks? So it was never our intent to bring that information in to argue that he could not appreciate the wrongfulness of what he was saying, because that was an insanity defense or perhaps a diminished capacity defense. And we were very clear that we were not presenting an insanity defense. We were not presenting a mental, you know, a deficient mental defense. But again, because... How is that different than establishing that he didn't have a subjective understanding to know he was making a threat? It seems like you just said in response to Judge Rovner's question that you weren't seeking to admit this as to that subjective understanding. We were seeking to admit it to rebut the government's subjective mens rea. How would it do that given what you just said? Because the totality of all of his, of what he was saying, the totality of how he reacted to other authority figures, you know, the evidence that we were prevented from, the proffered evidence, both from the Park Center people and then from the Fort Wayne Police Department, that not only went to the subjective nature of, do I understand what I'm saying is threatening? But it also went to the element in this case of whether or not he was intending to impede, interfere, or intimidate somebody who was acting in their official duty. Let's take the first element, the subjective understanding. How would his outbursts to authority when he's agitated suggest that he didn't know the threatening nature? Well, he's making threats to them, but I don't see anything in those interactions that would support he didn't understand what he was saying was threatening in nature. Well, he was making threats, and again we're talking about it, a time frame within the charging information from May of 2022 to February of 2023. Stay within that time frame, which is the government was permitted to do. They brought in some information. What the government brought in was different because it dealt with either statements about the assistant U.S. attorney or statements and outbursts that were made when he was at the courthouse. So I think that's different than happening at a police station. But I think that other information is relevant to one of the material elements here, to two material elements, one to the subjective intent. So if it's relevant information, then in order for it to be admissible, we have to go to a 404. So how is it relevant? I guess that's my question, and I think that's what Judge Rovner was getting at as well. The fact that he had these outbursts and made threats to other law enforcement, how is that relevant to show he didn't understand they were threats? There were never consequences to him when he made those other threats. So, you know, when in our trial, there was information that one of the U.S. Marshals who walked him out of the building on the day that one of the threats was made, that Damon was screaming at him, I'm going to shoot you in the head, that was a federal officer who made a very direct threat, I'm going to shoot you in the head, and all they wanted to do was get him out of the building, and they continued to watch him walk down the street. So there was no consequence to him. And it was similar to when he, you know, the proffer testimony from the two Fort Wayne police officers in late June of 2022 were both very specific threats to those officers, and he was never prosecuted, arrested, or charged in any way. So the lack of consequence means that perhaps he did not understand, because nobody was responding to his threats, and some pretty violent threats, because nobody was responding to them. I think that goes directly to whether or not he understood what those threats were. You know, it appears that he was able to introduce testimony from the security officers at both the Allen County Courthouse and the federal courthouse who testified that he had threatened them when they wouldn't let him speak to the assistant U.S. attorney. So I guess, you know, to that extent, he was able to show that it was typical of him to threaten an authority figure when they would not give him what he was asking for. Well, both, so the Allen County Prosecutor's Office, the person who came in and testified about that, that was how Mr. Taylor got to the alleged victim. Showed up there asking for this person by name, and they said, oh, she's down at the federal courthouse. So under the judge's ruling, it was related enough to this alleged victim that it came in, because that's how he got down to the federal courthouse. And then, TFO Demarest, again, that was at the federal courthouse that we were able to talk about, you know, mostly on cross-examination, what was going on at the time. Thank you. Do I reserve the remainder of your time? Yes, please. Thank you, Ms. Krause. Ms. Barron, we'll move to you. Good morning, Your Honors. May it please the Court. The District Court acted within its discretion when it excluded evidence of the defendant's behavior on days other than the days he threatened the victim, AUSA, and bearing no relationship to that, AUSA. Your Honors, and Defense Counsel had previously discussed, you know, what is the relevance of his encounters with the Park Center or Parkview personnel and the police officers? And one thing Defense Counsel just argued was it shows that there were never consequences to him. I don't think that's borne out by the record. The record reflects that on May 16th of 22, the defendant walked into the U.S. Attorney's Office. He actually made a threat directly to the victim, AUSA. He was asking her for his documents and she didn't have them. And he said at the end of all this, something along the lines of he was going to shoot things up or blow things up. And she told him, you can't make threats. And he said, what threats? And that evidence came in at trial. When he came on May 20th to the federal courthouse, he did experience consequences for his actions because the CSOs would not let him up to see the AUSA, because the last time he was there, he had made threats. Now, Ms. Marron, the other side of the coin, why wasn't it relevant and appropriate for the jury to be made aware that the sorts of threatening remarks he made to the assistant U.S. attorney were by no means confined to her and that there were other occasions and circumstances in which he made similar remarks when he got frustrated with an authority figure? Maybe that doesn't speak directly to his subjective understanding of how the assistant would interpret his statements. But if, let's see, if he regularly made such remarks to lots of people, doesn't that at least raise a possibility that the remarks were a kind of reflex for him and that he didn't necessarily appreciate how they would be received? Respectfully, no, I don't think so. The fact that an individual threatens multiple individuals and acts in a threatening manner to a cross-section of individuals doesn't tell us anything about his intent with respect to this particular victim, which is what the statute is asking us. Is he intending to impede or intimidate this victim? If he has lots of intents to impede and intimidate other people, that's not really giving us the information we need about this victim. In this particular case, he had a number of other opportunities to learn that the statements he was making were going to have consequences for him. He got barred from seeing the AUSA. He got stopped at the door multiple times at the courthouse. They wouldn't take his calls after he called at the U.S. Attorney's Office. He got interviewed by the United States Marshals in June of 2022 and interviewed about those threats and he declined to talk about them. Even when, in terms of the evidence defense introduced during the trial, there was evidence that when he was yelling at the Allen County Prosecutor's Guard, so that was Gary Hamilton at the Allen County Prosecutor's Office, he picked up the phone to call 911 and the defendant backed away, understanding, look, there are consequences to my actions. With respect to the record, to some of the claims made by the defendant is that he regularly engaged in this pattern of bizarre and paranoid conduct, but that's not really borne out by the evidence that he sought to introduce. The Park Center witnesses were not really testifying and they were not testifying to threats that he had made during their interactions. He had never threatened either of the Park Center witnesses. Instead, they were describing in unmistakably clinical terms that they believed him to be delusional on occasion and that his mental state varied over the course of their conversations with him. That's not evidence that's particularly helpful to the jury. How is a jury supposed to interpret what being delusional means? How does that give them any information as to whether in these particular instances he understood what he was saying? What that is, and what I think the judge correctly recognized it was, is a backdoor insanity defense, which the defense defendant claimed on one hand he wasn't introducing, but the only logical conclusion of some of the evidence that he proffered and he claims was wrongly excluded is that that's in fact what he did. And the district court rightly exercised her discretion to exclude that as not helpful to the jury. Why wouldn't the jury instructions have addressed that concern? So she did, the district court did instruct the jury that mental health was not a  And normally we say that limiting, juries are presumed to follow their instructions and limiting instructions are effective. Limiting instructions are effective when we have otherwise relevant evidence. Where I think they can't be effective is if the evidence isn't relevant at all. And you can't put before a jury evidence that's clearly not relevant and then tell them to disregard it. I believe the instruction was that they could consider it only for whether he understood, had a subjective understanding. But on the other hand, that mental health or mental illness wasn't a defense in the  In this particular case, the district court was rightly concerned that that would just be too confusing for them to parse, especially when the proffered testimony was really evidence, honestly, in the in the neighborhood of expert testimony evidence. This is not the kind of evidence where somebody comes in and says, look, he came into my office, he was threatening that he was going to shoot me and he was doing this and he was doing that. He seemed unconscious. He seemed to not comprehend the seriousness of what he was saying. There was never testimony proffered by the defendant that that was the case, that he would run around making threats and not have a logical connection or a logical understanding of the words that were coming out of his mouth. The trial evidence, all of it, both presented by the government and the defense, showed the opposite. The defendant was a rational actor. He made threats when he didn't get what he wanted. And he made threats to try and persuade people to give him what he wanted. You know, can I take you somewhere else for a moment, because I gather that he knew or thought he knew the assistant U.S. attorney from her prior tenure as a county prosecutor. How does that bear on the question of whether he intended to interfere with the performance of her federal duties as an assistant U.S. attorney? His knowledge of her past career, I don't think bears directly on whether he intended to impede her as a federal prosecutor. It goes to show his fixation with her and his understanding that she, in her role as a prosecutor, was doing something to him. She was trying to frame him. She was holding documents that he believed she had. The only relationship that Damon Taylor and the victim, AUSA, had was that he believed she was using her office to hurt him in some way. And he wanted to take her time and take her attention to get her to advocate on his behalf or change her position. And he understood that there had been a change, right, that she had been with the state. That's what he told the marshals in June of 22. She had been with the state for 25 years and that she was now with the federal government. He knew where to go to find her and he was going to the federal courthouse. There was no mistake at that point as to where he was going and where he thought she was working against him. In any event, even if this court were to conclude that the judge had abused her discretion here, if there was error, it's certainly harmless. The record is full of instances in which defense counsel was able to introduce evidence as to the defendant's mental state, as to some of the defendant's belief about the FBI as a villain in a conspiracy theory, evidence about his angry outbursts on multiple occasions against a variety of authority figures. And in her closing, defense counsel argued that defendant was, by virtue of this, unable to form the requisite subjective understanding. All of that evidence was put before the jury. Unless your honors have further questions, I will stand on our brief and ask this court to affirm the decision of the district court and the defendant's conviction. Thank you, Ms. Barron. Ms. Krause, we'll go back to you. Two minutes for rebuttal. So because context matters, the abuse of a discretion that occurred here in creating a one-sided narrative at trial, the government was permitted to bring in the 404 evidence. They were able to argue, and their evidence supported the argument, that Damon became fixated on this assistant AUSA when, in fact, he had no idea who she was. He thought she had his EBT card, and all he wanted was his EBT card back. The information that he intended to introduce is sort of your basic 404 evidence. It's interesting that when the judge ultimately ruled that the evidence was not admissible, she found that her ruling was the Supreme Court's opinion can only be understood to say that under Arizona law, as announced in Mott, an Arizona defendant is not prohibited from presenting observational evidence to rebut mens rea. Nothing more is expressly held or reasonably inferred. The defendant here is not charged with an Arizona criminal offense, nor is this court bound by the holdings of the Arizona Supreme Court. Clark does not extend to say anything about the admissibility of observational evidence the defendant is now offering. If the judge misapplied Clark v. Arizona, finding that it was strictly limited observational evidence, and what Clark was talking about was strictly limited to Arizona defendants and Arizona law, then she misapplied that case, and then it's a per se abuse of discretion. And it's also interesting that in finding that, all the discussions that were had about the admissibility of that proffered evidence, the judge never directly said it's not relevant. She always talked about the confusion that it would cause the jury. She talked about, she at one point said that the evidence was probative, she said the proffered evidence is not probative and runs the risk of confusing the jury and will not be permitted. If we're talking about probative evidence, and we're talking about whether or not it confuses the jury, we've already gone into the realm of a 403 balancing test. Before we get to 403, we have to determine whether or not it's relevant information. We don't get to that until we get to 403, so here the information was relevant, it's referred by the judge's rulings, and her abuse of discretion was either per se or harmless. It was not harmless because we were completely devoid of the ability to rebut that mens rea. Thank you, Ms. Krause. Thank you, Ms. Barron. The case will be taken under advisement.